**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

LINDA L. HAWLEY,

                Plaintiff,

       -v-                            5:24-CV-248 (AJB/TWD)

OPWDD-CENTRAL NY DDSO,

                Defendant.
_____

**APPEARANCES:**                           **OF COUNSEL:**

LINDA L. HAWLEY
Plaintiff, Pro Se
228 Maple Drive
Oneida, NY 13421

HON. LETITIA JAMES                     BRIAN W. MATULA, ESQ.
New York State Attorney General         Assistant Attorney General
Attorneys for Defendant
The Capitol
Albany, NY 12224

**Hon. Anthony Brindisi, U.S. District Judge:**

## <u>DECISION and ORDER</u>

## I.    INTRODUCTION

      On February 20, 2024, *pro se* plaintiff Linda Hawley ("Hawley" or "plaintiff") filed this employment discrimination action alleging that her employer, defendant New York State Office for People with Developmental Disabilities ("OPWDD" or "defendant"), violated her civil rights under Title VII and related state law.  Dkt. No. 1.  The action was assigned to U.S. District Judge Mae A. D'Agostino, Dkt. No. 3, who gave plaintiff leave to file an amended complaint and set a briefing deadline for any pre-answer motion practice.

Broadly speaking, Hawley's amended complaint alleges that she received a regular series of promotions from OPWDD until January of 2008, when she disclosed that she was a lesbian in a same-sex relationship. Dkt. No. 30. Thereafter, defendant began to discriminate against her on the basis of her sex and/or her sexual orientation. *Id*. According to plaintiff, defendant failed to promote her on as many as twenty-three separate occasions, retaliated against her on five others, and subjected her to a hostile working environment. *See id*.

On October 3, 2024, OPWDD moved to dismiss plaintiff's amended complaint pursuant to Rule 12(b)(1) and Rule 12(b)(6) of the Federal Rules of Civil Procedure. Dkt. No. 31. After defendant's motion was fully briefed, Dkt. Nos. 35, 36, the matter was reassigned to this Court for all further proceedings, Dkt. No. 37.

The motion will be considered on the basis of the submissions without oral argument.

## II.    BACKGROUND

The following facts are taken from Hawley's amended complaint, attached exhibits, and documents incorporated by reference.[1] Dkt. No. 30. They are assumed true for the purpose of resolving OPWDD's motion to dismiss.

On December 5, 1996, Hawley began her career at OPWDD as a Developmental Support Aide Trainee (Grade 7) at the Central New York Developmental Disabilities Services Office (the "Central NY DDSO"). Am. Compl. ¶¶ 1, 5. Plaintiff soon took advantage of defendant's tuition assistance programs, put herself through college, and obtained a master's degree in sociology, a relevant field of study for her work. *See id*. ¶ 5. Plaintiff received a series of promotions: she was elevated from Developmental Support Aide Trainee (Grade 7), to Developmental Support

---

[1] In addition to her amended pleading, plaintiff has filed a "timeline" with attachments, Dkt. No. 38, and a letter with exhibits, Dkt. No. 39. These documents are not part of the operative pleading, but because plaintiff is *pro se*, these extraneous submissions have also been examined. They will be referenced as necessary to help determine the nature and sufficiency of her claims. *See Boguslavsky v. Kaplan*, 159 F.3d 715, 719 (2d Cir. 1998).

Aide (Grade 9), to Habilitation Specialist I (Grade 14), and finally to Habilitation Specialist II (Grade 17). *Id.*

In January of 2008, just after being promoted to Habilitation Specialist II, Hawley "spoke openly about being gay and in a monogamous relationship with a woman who would be [her] future wife and partner of nearly 17 years now." Am. Compl. ¶ 6. Plaintiff alleges that after she disclosed her sexual orientation and this same-sex relationship, OPWDD denied her "numerous promotions in situations where [she] was the better candidate" and awarded the jobs to others who "did not possess [her] protected status as a lesbian." *Id.* ¶ 2.

### A. 2018 – One Missed Promotion

On February 1, 2018, Hawley, along with "every other Program Director" at OPWDD, was promoted to Rehabilitation Counselor II (Grade 19). Am. Compl. ¶ 7. As plaintiff explains, defendant's "Leadership" decided to promote all of the Program Directors because they "were working at a higher grade than what [they] were being paid." *Id.*

On May 2, 2018, Hawley applied for the position of Developmental Disabilities Program Specialist I. Am. Compl. ¶ 8. But she was not awarded the position. *Id.* According to plaintiff, someone without her "protected status as a lesbian was hired instead." *Id.*

### B. 2019 – One Missed Promotion & One Instance of Retaliation

On January 11, 2019, Hawley applied for the position of Treatment Team Leader. Am. Compl. ¶ 9. But she later learned that she had not been awarded this position. *Id.* Dkt. No. 38 ("Timeline") at 1 (describing an October 18, 2019 e-mail from human resources).[2] According to plaintiff, a less-qualified heterosexual woman with less relevant experience named Rebecca Leo received this promotion instead. Am. Compl. ¶¶ 9, 128–31 (characterizing the hiring rationale as

---

[2] Pagination corresponds with CM/ECF headers.

"outrageous"). Soon thereafter, OPWDD even changed the job duties of this Treatment Team Leader role to accommodate Ms. Leo's lack of relevant qualifications. *Id*. ¶ 11; Timeline at 1.

On October 31, 2019, Hawley filed a union grievance about this missed promotion. Am. Compl. ¶ 12. Six weeks later, plaintiff's "adoptive parents"—who ran a Family Care Home for individuals with disabilities—were reported to the "Justice Center," a state agency charged with the protection of people with special needs. *See id*. ¶ 14. As a result, plaintiff's parents' group home was closed and four individuals who had lived there for nearly two decades were relocated, which left her family "in shock and completely heartbroken." *Id*.; Timeline at 1.

Hawley alleges that her parents' group home had never received a single write-up or been assessed any deficiencies in its thirty years of operation. Am. Compl. ¶ 14. Even so, the Justice Center claimed that closure of the home was warranted because plaintiff's father "had taken an individual with high cholesterol out to McDonald's for pancakes after fasting bloodwork." *Id*. In plaintiff's view, this report and investigation "has a suspicious timeline" and "now, looking back, [she] believe[s] it was retaliation" for her union grievance on October 31, 2019. *Id*. ¶ 12.

### C. 2020 – Two Missed Promotions & One Instance of Retaliation

On April 6, 2020, Hawley learned that she had not been awarded a promotion to the position of Developmental Disabilities Program Specialist I. Am. Compl. ¶ 15. Plaintiff alleges someone without her "protected status as a lesbian was hired instead." *Id*.

On April 29, 2020, Hawley applied for the position of Treatment Team Leader. Am. Compl. ¶ 16. But she was not awarded the position. *Id*. Plaintiff alleges someone without her "protected status as a lesbian was hired instead." *Id*.

On July 6, 2020, Hawley learned that her earlier-filed union grievance had "proceeded to the last level in the internal grievance process before becoming 'owned by the union[,]' which meant it did not go anywhere further." Am. Compl. ¶ 17; Timeline at 1.

On August 19, 2020, Hawley e-mailed an OPWDD Human Resources representative because she believed that there was "an error affecting" her "Civil Service Exam Score." Am. Compl. ¶ 18. As plaintiff explains, she had initially received a score of "80." *Id.* But she had re-taken the exam and received a score of "85." *Id.* Although "all the other agencies were using [her] new score of 85," plaintiff believed that the agencies in "Central New York and Broome were using [her] old score of 80." *Id.* Plaintiff alleges the representative told her that the "old" score is "still good for 60 days," and that an agency is entitled to use either list until this 60-day period expires. *Id.* According to plaintiff, she "believed this to be a form of retaliation in that the [d]efendant controlled a situation in such a way that [she] could not possibly sit for an interview." *Id.*

### D. 2021 – Four Missed Promotions

On August 23, 2021, Hawley applied for the position of Developmental Disabilities Program Specialist I. Am. Compl. ¶ 20. But she was not awarded the position. *Id.* Plaintiff alleges someone without her "protected status as a lesbian was hired instead." *Id.*

On September 9, 2021, Hawley applied for two Treatment Team Leader positions. Am. Compl. ¶ 21. But she was not awarded either position. *Id.* Plaintiff alleges that others without her "protected status as a lesbian were hired instead." *Id.*

On September 23, 2021, Hawley learned that she had not been awarded a promotion to the position of Developmental Disabilities Program Specialist I. Am. Compl. ¶ 22. Plaintiff alleges someone without her "protected status as a lesbian was hired instead." *Id.* As plaintiff

explains, she "was at the top of the 95 percent scores on the eligibility list" for this position and "within the top 10 candidates statewide." *Id*. According to plaintiff, "no other OPWDD / Central New York DDSO employees [ ] scored higher, yet many were given promotions over [her] that did not share [her] protected status as a lesbian." *Id*.

### E.  2022 – Three Missed Promotions

On February 28, 2022, Hawley applied for the position of Developmental Disabilities Program Specialist I.  Am. Compl. ¶ 24.  But she was not awarded the position.  *Id*.  Plaintiff alleges someone without her "protected status as a lesbian was hired instead."  *Id*.

On March 2, 2022, Hawley applied for the position of Treatment Team Leader.  Am. Compl. ¶ 25.  But she was not awarded the position.  *Id*.  Plaintiff alleges someone without her "protected status as a lesbian was hired instead."  *Id*.

On March 21, 2022, Hawley applied for the position of Treatment Team Leader.  Am. Compl. ¶ 26.  But she was not awarded the position.  *Id*.  Plaintiff alleges someone without her "protected status as a lesbian was hired instead."  *Id*.

On April 26, 2022, Hawley filed her initial administrative charge of discrimination with the Equal Employment Opportunity Commission ("EEOC").  Am. Compl. ¶ 27; Timeline at 2.  Thereafter, she applied for another promotion.  *See* Am. Compl. ¶ 28.  A few weeks later, on May 11, 2022, plaintiff's previous supervisor called her to discuss an upcoming interview that plaintiff had obtained.  *Id*. ¶ 28.  Plaintiff alleges that this "felt suspicious in that moment."  *Id*.  A week later, HR called plaintiff to inform her that she had been promoted to Developmental Disabilities Program Specialist I (Grade 21).  *Id*. ¶ 29.

On June 13, 2022, OPWDD submitted its "position statement" to the EEOC in response to plaintiff's April 26, 2022 charge.  Am. Compl. ¶ 30.  A few days later, plaintiff began working

in her new role as a Developmental Disabilities Program Specialist I.  *Id*. ¶ 31.  There, plaintiff

received "only positive reviews."  *Id*.  She enjoyed her new job and her new team for the next six

months or so.  *Id*.  In fact, plaintiff was even nominated for Employee of the Year.  *See id*. ¶ 32.

On December 16, 2022, Hawley learned from the EEOC that her "rebuttal" to OPWDD's

position statement was due.  Am. Compl. ¶ 33.  Plaintiff submitted her "first rebuttal" a few days

later, claiming sexual-orientation discrimination on the basis of being passed over for "numerous

promotions" that were given to less-qualified heterosexuals.  *Id*. ¶ 34.  According to plaintiff, she

is a strong supervisor: she scored "very well" on her civil service examinations in the category of

"supervisory skills," has been nominated for Supervisor of the Year (in 2010 and 2022), is the

only supervisor "to ever achieve zero deficiencies (perfect review)," and has "had only positive

reviews and no history of disciplinary actions."  *Id*. ¶¶ 37, 40.

### F. 2023 – Twelve Missed Promotions & Three Instances of Retaliation

On January 11, 2023, twenty days after she filed her "first rebuttal," OPWDD moved

Hawley to the "worst cubicle location in the entire building."  Am. Compl. ¶ 47.  As plaintiff

explains, this cubicle is "two feet away from an outside door with a high traffic area" and is

"cold or hot depending on the season."  *Id*. ¶ 48.  In plaintiff's view, "[e]veryone that works

within this office knows that this is the worst cubicle[:] it is infamous."  *Id*. ¶ 49.  According to

plaintiff, defendant forced her to move in "retaliation" for filing her rebuttal.  *Id*. ¶ 47; Timeline

at 2 (characterizing this event as "possible retaliation").

On January 23, 2023, Hawley received a so-called "right-to-sue" letter from the EEOC,

which notified her that the agency was dropping its administrative investigation and that she had

ninety days in which to file a state or federal lawsuit.  Am. Compl. ¶ 50; *see also* Dkt. No. 30 at

7–8.  But plaintiff soon became convinced that the EEOC and OPWDD failed to realize that her

complaint involved sexual-orientation discrimination rather than merely sex discrimination.  Am. Compl. ¶ 51.  Plaintiff convinced the EEOC to reconsider its determination, *id*. ¶¶ 52–53, and the EEOC revoked the first right-to-sue letter, Dkt. No. 30 at 9 (Notice of Intent to Reconsider).

On May 1, 2023, OPWDD submitted a new position statement to the EEOC in response to plaintiff's reconsidered EEOC complaint.  Am. Compl. ¶ 55.

On May 19, 2023, Hawley applied for the position of Treatment Team Leader.  Am. Compl. ¶ 56.  But she was not awarded the position.  *Id*.  Plaintiff alleges someone without her "protected status as a lesbian was hired instead."  *Id*.

On May 26, 2023, Hawley applied for the position of Treatment Team Leader.  Am. Compl. ¶ 57.  But she was not awarded the position.  *Id*.  Plaintiff alleges someone without her "protected status as a lesbian was hired instead."  *Id*.

On July 2, 2023, Hawley was working overtime at Individualized Residential Alternative housing when one of the individuals experienced a "behavioral episode" that required her to call 911.  Am. Compl. ¶ 58.  As plaintiff explains, "this person threatened [her] with a large fire extinguisher."  *Id*.  Plaintiff alleges that she and a co-worker pressed criminal charges against this person.  *Id*.  Thereafter, OPWDD supervisory employees asked her to sign a "Protective Measures Memo" that contained a copy of the police report and defendant's internal incident report.  *Id*. ¶¶ 59–61.  According to plaintiff, this memorandum restricted her from working with the person who had threatened her "at any location pending the outcome of court proceedings."  *Id*. ¶ 61.  Plaintiff later received a state-court Order of Protection against this person.  *Id*. ¶ 63.

On July 13, 2023, Hawley applied for the position of Program Operations Specialist II.  Am. Compl. ¶ 62.  But she was not awarded the position.  *Id*.  Plaintiff alleges someone without her "protected status as a lesbian was hired instead."  *Id*.

On August 1, 2023, Hawley was sitting at her desk when she suddenly saw and heard the voice of the person who had threatened her. Am. Compl. ¶ 65. Plaintiff hid behind her desk until he left the area. *Id*. Afterward, she ran to the Workplace Violence Coordinator's Office to report the situation. *Id*. ¶ 66. The Coordinator summoned one of OPWDD's HR representatives. *Id*. After plaintiff explained to HR what had happened, defendant's representative "immediately left and instructed the staff with the individual to leave immediately." *Id*. ¶ 67.

Hawley later reported the incident to her union representative, who instructed her to file a police report. Am. Compl. ¶¶ 68–69. Plaintiff also reported to the union that she had heard from an unidentified co-worker that "management knew about this and let it happen anyway." *Id*. ¶ 68. According to plaintiff, "this action was retaliatory." *Id*.; Timeline at 2.

On August 1, 2023, Hawley called the police to inform them that the Order of Protection had been violated. Am. Compl. ¶ 70. Plaintiff spoke with a sheriff's deputy, who "felt it wasn't the individual's fault that he had violated the Order of Protection" because "this individual had no control over his travels and he had no idea where [plaintiff] worked." *Id*. ¶¶ 71–72. The sheriff's deputy told plaintiff that he planned to call OPWDD's Agency Director to determine what had happened and that he "felt that Central New York DDSO was to blame." *Id*. ¶¶ 72–73.

On August 2, 2023, Hawley's union representative e-mailed OPWDD to request a Safety Plan for plaintiff to prevent a similar incident from happening in the future. Am. Compl. ¶ 74. In response, defendant's management personnel suggested that the individual in question "stay inside the van during the mail run." *Id*. ¶ 75. Plaintiff objected to this proposal. *Id*. ¶ 76. As plaintiff explained, she sometimes left the building and walked to her car in the parking lot. *Id*. According to plaintiff, she informed defendant's supervisors that this proposal would "be in

direct violation of the Order of Protection" and cautioned that "they're not allowed to make up their own rules and must follow the Judge's order."  *Id*.

On August 3, 2023, Hawley applied for the position of Treatment Team Leader.  Am. Compl. ¶ 79.  But she was not awarded the position.  *Id*.  Plaintiff alleges someone without her "protected status as a lesbian was hired instead."  *Id*.

On August 30, 2023, after receiving a brief extension of time, Hawley submitted her "second rebuttal" to OPWDD's second position statement, which defendant filed in response to the EEOC's decision to reconsider plaintiff's charge.  Am. Compl. ¶¶ 77–78, 80.  As discussed below, this is also the date on which plaintiff filed an "amended" EEOC charge.  *See id*.

On September 22, 2023, Hawley applied for the position of Treatment Team Leader.  Am. Compl. ¶ 81.  But she was not awarded the position.  *Id*.  Plaintiff alleges someone without her "protected status as a lesbian was hired instead."  *Id*. ¶¶ 81, 91.

On September 25, 2023, Hawley interviewed for the position of Treatment Team Leader.  Am. Compl. ¶ 82.  But she was not awarded the position.  *Id*.  According to plaintiff, a less-qualified woman with less relevant experience named Johanna Reed received this promotion.  *Id*. ¶¶ 83, 85–87, 105–109.  Plaintiff alleges Ms. Reed had a "very close friend" on the interview panel.  *Id*. ¶ 84.  In plaintiff's view, this interviewer should have recused herself.  *Id*.  Plaintiff shared this information with her union representative.  *Id*.  Plaintiff also told OPWDD's Deputy Director about the apparent conflict, who assured plaintiff that they "were aware and that they were 'keeping an eye on the situation.'"  *Id*. ¶¶ 88–89.  Plaintiff also sent this information to the EEOC, which "listed it as evidence."  *Id*. ¶¶ 91–92.

On September 27, 2023, Hawley applied for the position of Program Operations Specialist II. Am. Compl. ¶ 90. But she was not awarded the position. *Id.* Plaintiff alleges someone without her "protected status as a lesbian was hired instead." *Id.*

On October 18, 2023, Hawley applied for two Treatment Team Leader positions. Am. Compl. ¶ 93. But she was not awarded either position. *Id.* Plaintiff alleges that someone without her "protected status as a lesbian was hired instead." *Id.*

On November 6, 2023, Hawley interviewed for the position of Program Operations Specialist II. Am. Compl. ¶ 94. But she was not awarded the position. *Id.* Plaintiff alleges that someone without her "protected status as a lesbian was hired instead." *Id.*

On November 9, 2023, while Hawley was on a video call, Ms. Reed "came up behind [her] . . . and glared at [her] just a few inches from the back of [her] head." Am. Compl. ¶ 95; Timeline at 3. One of plaintiff's co-workers "saw this clearly." Am. Compl. ¶ 95. Plaintiff and her co-worker were "stunned" and "immediately stopped [their] meeting." *Id.* Plaintiff reported Ms. Reed's "retaliation" to her union, who told her to inform Administration. *Id.* ¶ 96. The next day, plaintiff sent information about this incident to the EEOC, which listed it as evidence. *Id.* ¶ 97. Plaintiff also had a conversation with Ms. Reed's supervisor, who seemed "puzzled" about why "Ms. Reed would do something like this" but informed plaintiff that "she will speak to her about her conduct." *Id.* ¶¶ 99–100.

On November 16, 2023, Hawley learned that she had not been awarded one of the Treatment Team Leader positions to which she had applied. Am. Compl. ¶ 101. Plaintiff alleges that someone without her "protected status as a lesbian was hired instead." *Id.*

On November 22, 2023, Hawley learned that she had not been awarded the other Treatment Team Leader position to which she had applied.  Am. Compl. ¶ 102.  Plaintiff alleges that someone without her "protected status as a lesbian was hired instead." *Id*.

On November 28, 2023, Hawley received a second right-to-sue letter, which notified her that the EEOC was again dropping its investigation and that she had ninety days in which to file a state or federal lawsuit.  Am. Compl. ¶ 103; *see also* Dkt. No. 30 at 10–11.  Plaintiff filed this action on February 20, 2024.

## III.    LEGAL STANDARDS

### A.  Rule 12(b)(1)

The Federal Rules of Civil Procedure permit a party to move to dismiss a complaint for "lack of subject-matter jurisdiction."  FED. R. CIV. P. 12(b)(1).  "A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it."  *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000).  The plaintiff bears the burden of proving subject-matter jurisdiction by a preponderance of the evidence.  *Id*.

Rule 12(b)(1) motions can be "facial" or "fact-based."  *See Carter v. HealthPort Techs., LLC*, 822 F.3d 47, 56–57 (2d Cir. 2016).  A "facial" Rule 12(b)(1) motion is "based solely on the allegations of the complaint or the complaint and exhibits attached to it."  *Id*. at 56.  Under those circumstances, the plaintiff bears no evidentiary burden.  *Katz v. Donna Karan Co., L.L.C.*, 872 F.3d 114, 119 (2d Cir. 2017).  Instead, the court must determine whether the complaint and its exhibits plausibly allege facts giving rise to subject-matter jurisdiction.  *Carter*, 822 F.3d at 56.

In contrast, a "fact-based" Rule 12(b)(1) motion permits a defendant to proffer evidence outside of the pleading.  *See Carter*, 822 F.3d at 57.  In that scenario, the plaintiff will ordinarily

need to come forward with evidence of their own to controvert the defendant's showing.  *Id*.  If the defendant identifies "material and controverted" extrinsic evidence, the court "will need to make findings of fact in aid of its decision."  *Id*.  However, "if the evidence proffered by the defendant is immaterial because it does not contradict plausible allegations that are themselves sufficient to show [subject-matter jurisdiction]," the plaintiff may rely on their pleading.  *Id*.

### B. Rule 12(b)(6)

The Federal Rules of Civil Procedure permit a party to move to dismiss a pleading for "failure to state a claim upon which relief can be granted."  FED. R. CIV. P. 12(b)(6).  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, 'to state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id*.

To assess this facial plausibility requirement, the court "must accept as true all of the factual allegations contained in the complaint," *Erickson v. Pardus*, 551 U.S. 89, 94 (2007), and draw all reasonable inferences in favor of the plaintiff, *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002).  In doing so, the court generally confines itself to the facts alleged in the pleading, documents attached to the complaint or incorporated into it by reference, and matters of which judicial notice may be taken.  *Goel v. Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016).

## IV.    DISCUSSION

OPWDD has moved to dismiss the amended complaint in its entirety.  Def.'s Mem., Dkt. No. 31-1 at 5–23.  Defendant contends that all but two of Hawley's Title VII claims are untimely or unexhausted.  *Id*. at 5–10.  As defendant explains, plaintiff's claims arising from any conduct

before June 30, 2021, are untimely because those events occurred more than 300 days prior to the date on which she filed her EEOC charge. *Id*. at 5–7. Timeliness aside, defendant argues that virtually all of plaintiff's Title VII claims are unexhausted because the only discriminatory or retaliatory act that she identified in her initial or amended EEOC charge was for the missed promotion that occurred on September 23, 2021. *Id*. at 8–10. Finally, to the extent that two (or more) of plaintiff's Title VII claims are timely *and* exhausted, defendant argues that the amended complaint fails to plausibly allege facts giving rise to the minimal inference of sex- or sexual-orientation-based animus or retaliatory intent necessary to avoid dismissal. *See id*. at 11–23.

OPWDD has moved to dismiss under Rule 12(b)(1) and 12(b)(6). Besides the distinction between facial and fact-based 12(b)(1) motions mentioned *supra*, the standards of review under these two provisions are "substantively identical." *Lerner v. Fleet Bank, N.A.*, 318 F.3d 113, 128 (2d Cir. 2003), *abrogated on other grounds by Biocad JSC v. F. Hoffmann-La Roche*, 942 F.3d 88, 94 n.5 (2d Cir. 2019). Even so, courts usually tackle 12(b)(1) arguments first: jurisdictional challenges go to the ability to entertain a dispute, so they should be resolved before reaching any merits-based questions, such as plausibility. *See, e.g.*, *Daly v. Citigroup Inc.*, 939 F.3d 415, 426 (2d Cir. 2019).

OPWDD's briefing contends that the question of whether Hawley properly exhausted her administrative remedies under Title VII qualifies as a Rule 12(b)(1) argument. Def.'s Mem. at 7. But neither exhaustion nor timeliness are treated as jurisdictional obstacles under Title VII. *See, e.g.*, *Hardaway v. Hartford Pub. Works Dep't*, 879 F.3d 486, 491 (2d Cir. 2018) (treating Title VII exhaustion as affirmative defense); *McPherson v. N.Y. City Dep't of Educ.*, 457 F.3d 211, 214 (2d Cir. 2006) (treating timeliness as analogous to a statute of limitations). Accordingly, the Court will consider all of defendant's arguments as arising under Rule 12(b)(6).

Before beginning that analysis, however, it is important to bear in mind that plaintiff is *pro se*.  As plaintiff explains, she retained counsel in March 2023 after winning reconsideration from the EEOC, Am. Compl. ¶ 54, but was dropped as a client after her lawyer switched firms, *id.* ¶ 64.  Accordingly, plaintiff's filings must be held to less stringent standards than pleadings drafted by an attorney.  *See, e.g.*, *Ahlers v. Rabinowitz*, 684 F.3d 53, 60 (2d Cir. 2012).

Instead, as the Second Circuit has repeatedly explained, *pro se* filings must be "construed liberally" with "special solicitude" and interpreted to raise the strongest claims that they suggest. *See Hogan v. Fischer*, 738 F.3d 509, 515 (2d Cir. 2013).  "This is particularly so when the *pro se* plaintiff alleges that her civil rights have been violated."  *Sealed Plaintiff v. Sealed Defendant*, 537 F.3d 185, 191 (2d Cir. 2008).  But to avoid dismissal, the Second Circuit has held that even a *pro se* pleading "must state a plausible claim for relief."  *Hogan*, 738 F.3d at 515.

## A. Timeliness

First, OPWDD argues that some of Hawley's Title VII claims are untimely because they are based on discrete acts that occurred more than 300 days prior to the date on which she filed her EEOC charge. Def.'s Mem. at 5–7.  As defendant explains, plaintiff's amended complaint chronicles events spanning over five years.  *Id.* at 5.  But plaintiff did not file an administrative charge of discrimination with the EEOC until April 26, 2022.  *Id.* at 5.  According to defendant, any claims based on conduct alleged to have occurred before June 30, 2021, are therefore time-barred by the 300-day statutory filing requirement imposed by Title VII.  *See id.* at 6.

Under Title VII, a plaintiff must file a charge with the EEOC within 180 days or, in states like New York that have state-law administrative agencies for pursuing workplace discrimination claims, "within [300] days after the alleged unlawful employment practice occurred."  42 U.S.C. § 2000e-5(e)(1); *see also Duplan v. City of N.Y.*, 888 F.3d 612, 621 n.7 (2d Cir. 2018) (noting the

extended "look-back period" available to New York plaintiffs). This 300-day filing requirement

acts "like a statute of limitations," *Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385, 394 (1982),

which is an affirmative defense that may be raised on a pre-answer motion to dismiss where the

undisputed dates in the pleading show that a cause of action is time-barred, *Ghartey v. St. John's

Queens Hosp.*, 869 F.2d 160, 162 (2d Cir. 1989).

"When, as in this case, a plaintiff's allegations of discrimination extend beyond the 300-

day limitations period, the nature of the claim determines what consideration will be given to the

earlier conduct." *McGullam v. Cedar Graphics, Inc.*, 609 F.3d 70, 75 (2d Cir. 2010) (citation

omitted). As the Supreme Court has explained, the phrase "unlawful employment practice" in

Title VII generally refers to "a discrete act or single 'occurrence,'" even if it may be connected

with, or related to, other alleged misconduct. *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S.

101, 111 (2002). In other words, "[e]ach discrete discriminatory act starts a new clock for filing

charges alleging that act." *Id.* at 113; *see also King v. Aramark Servs., Inc.*, 96 F.4th 546, 559

(2d Cir. 2024) (explaining "each discrete act claim carries its own 300-day limitations period").

Measured against this timeliness requirement, any discrimination and retaliation claims

arising from conduct alleged to have occurred before June 30, 2021, *i.e.*, the conduct set forth in

the Background in parts II.A, II.B, and II.C, *supra*, must be dismissed.[3] This includes any claims

for discrimination based on plaintiff's four missed promotions in 2018, 2019, and 2020, as well

---

[3]  Plaintiff alleges that she submitted an online EEOC "inquiry" on December 16, 2021, a few months before she
filed her charge on April 26, 2022. Am. Compl. ¶ 23. The Supreme Court has held that an intake questionnaire can
qualify as an EEOC "charge" under the Age Discrimination in Employment Act, a statute which sets up a remedial
scheme that is broadly similar to Title VII. *Fed. Express Corp. v. Holowecki*, 552 U.S. 389, 402 (2008). Some
courts have extended this "permissive standard" to Title VII claims. *Price v. City of N.Y.*, 797 F. Supp. 2d 219, 225–
26 (E.D.N.Y. 2011). But others have not. *Hari-Aman James, Plaintiff v. N.Y. City Health + Hosps. Corp.*, 2025
WL 959093, at *11 (S.D.N.Y. Mar. 31, 2025) (collecting cases). If plaintiff's online EEOC inquiry were considered
a "charge," the 300-day cut-off would roll back to February 19, 2021. But the end result would be the same: the
conduct alleged in the Background in parts II.A, II.B, and II.C would be untimely.

as any retaliation claims based on the closure of her parents' group home in December of 2019 or the discrepancy in the way agencies treated plaintiff's exam score during the summer of 2020.

Each one of these alleged incidents is a discrete act or occurrence that triggered its own 300-day filing requirement under Title VII. *See, e.g.*, *Chin v. Port Auth. of N.Y. & N.J.*, 685 F.3d 135, 157 (2d Cir. 2012) ("[E]very failure to promote is a discrete act that potentially gives rise to a freestanding Title VII claim with its own filing deadline."); *Gutierrez v. City of N.Y.*, 756 F. Supp. 2d 491, 500 (S.D.N.Y. 2010) (applying discrete-act rule to incidents of retaliation).

There is an exception to this 300-day requirement for a "continuing violation." "Under the continuing violation exception to the Title VII limitations period, if a Title VII plaintiff files an EEOC charge that is timely as to any incident of discrimination in furtherance of an ongoing policy of discrimination, all claims of acts of discrimination under that policy will be timely even if they would be untimely standing alone." *Patterson v. Cnty. of Oneida, N.Y.*, 375 F.3d 206, 220 (2d Cir. 2004) (citation omitted).

But this exception does not save Hawley's time-barred claims. "The continuing violation exception applies when there is evidence of an ongoing discriminatory policy or practice, such as [the] use of discriminatory seniority lists or employment tests," or "where specific and related instances of discrimination are permitted by the employer to continue unremedied for so long as to amount to a discriminatory policy or practice." *Van Zant v. KLM Royal Dutch Airlines*, 80 F.3d 708, 713 (2d Cir. 1996) (cleaned up). However, "an untimely discrete act claim cannot be pulled into the limitations period by a claim premised on a continuing course of conduct, even if the course of conduct includes that discrete act." *King*, 96 F. 4th at 560; *Gutierrez*, 756 F. Supp. 2d at 500 (explaining purpose of the time-bar is "to preclude the resuscitation of stale claims").

- 17 -

Even liberally construed in light of her *pro se* status, plaintiff's amended complaint does not plausibly allege sufficient factual allegations to warrant discovery into a possible "continuing violation." *Chin*, 685 F.3d at 157 ("[A]n allegation of an ongoing discriminatory policy does not extend the statute of limitations where the individual effects of the policy that give rise to the claim are merely discrete acts."); *see also Miner v. Town of Cheshire*, 126 F. Supp. 2d 184, 190 (D. Conn. 2000) (explaining that "courts in this circuit disfavor application of the continuing violations doctrine and hold that only compelling circumstances warrant use of this exception to the statute of limitations").

Courts routinely enforce the 300-day time bar against the kind of discrete acts—missed promotions and incidents of retaliation—that are alleged in plaintiff's amended complaint. *See, e.g.*, *Rasko v. N.Y. City Admin. for Child. Servs.*, 734 F. App'x 52, 54 (2d Cir. 2018) (summary order) (affirming dismissal of *pro se* plaintiff's time-barred claims); *Reppert v. N.Y. State Dep't of State*, 2022 WL 2315603, at *7 & n.9 (N.D.N.Y. June 28, 2022) (Sannes, J.) (applying time-bar to *pro se* claims for failures-to-promote); *Szewczyk v. City of N.Y.*, 2018 WL 4688946, at *8 (E.D.N.Y. Sept. 28, 2018) (retaliation claims); *Blair v. L.I. Child & Fam. Dev. Servs., Inc.*, 2017 WL 722112, at *9 (E.D.N.Y. Jan. 31, 2017) (Report & Recommendation) (same), *adopted by* 2017 WL 728231 (E.D.N.Y. Feb. 21, 2017); *Boza-Meade v. Rochester Hous. Auth.*, 170 F. Supp. 3d 535, 545 (W.D.N.Y. 2016) (denials of overtime); *Harris v. NYU Langone Med. Ctr.*, 2013 WL 5425336, at *2 (S.D.N.Y. Sept. 27, 2013) (failures-to-promote); *Dimps v. N.Y. State Off. of Mental Health*, 777 F. Supp. 2d 659, 662 (S.D.N.Y. 2011) (denials of supervisory authority); *Lunardini v. Mass. Mut. Life Ins. Co.*, 696 F. Supp. 2d 149, 165 (D. Conn. 2010) (placement on probationary status).

The final exception to this 300-day rule would be found in equity.  Because the 300-day requirement is treated as a statute of limitations, it is "subject to waiver, estoppel, and equitable tolling." *Zipes*, 455 U.S. at 393.  And because Hawley is acting *pro se*, the Court has *sua sponte* considered whether equitable tolling might be warranted.  It is not.  Plaintiff's filings nowhere suggest that she suffered from a physical or mental impairment that might have prevented her from pursuing these claims in a timely fashion.  Plaintiff holds an advanced degree, continued working at OPWDD during each of the alleged incidents, and was able to grieve defendant's alleged actions through her union and, later, with the EEOC.

In short, there is no plausible indication of the kind of "exceptional circumstances" that might justify equitable relief.  *See, e.g.*, *Baroor v. N.Y. City Dep't of Educ.*, 362 F. App'x 157, 159 (2d Cir. 2010) (summary order).  The 228-day tolling period imposed in New York during the COVID-19 pandemic, N.Y. COMP. CODES R. & REGS. TIT. 9 §§ 8.202.67, 8.202.8 (2020), does not apply to save these claims, either.  *See, e.g.*, *Shin v. NBC Universal Media, LLC*, 2025 WL 438297, at *7 (S.D.N.Y. Feb. 7, 2025) (collecting cases explaining that COVID tolling is inapplicable to the 300-day requirement).  Accordingly, any discrimination or retaliation claims arising from discrete acts alleged to have occurred before June 30, 2021, must be dismissed.[4]

## B.  Exhaustion

Second, OPWDD argues that all but two of Hawley's timely discrimination or retaliation claims are unexhausted because the only discrete act that she identified in her initial or amended EEOC charge was for the missed promotion that occurred on September 23, 2021.  Def.'s Mem. at 8–10.  According to defendant, aside from the workplace reassignment that plaintiff suffered

---

[4] Plaintiff's hostile work environment claim requires a separate analysis, discussed *infra*.  *See, e.g.*, *Morgan*, 536 U.S. at 115 (characterizing hostile work environment claims as "different in kind from discrete acts").

as "possible retaliation" for filing her first EEOC rebuttal, plaintiff's failure to present all of her other discrete-act claims to the EEOC precludes her from raising them in this action.  *Id*.

Title VII requires a plaintiff to exhaust her administrative remedies before filing a suit in federal court.  42 U.S.C. §§ 2000e-5(e), (f).  Proper exhaustion requires a claimant to have "filed a timely complaint with the EEOC and obtained a right-to-sue letter."  *Legnani v. Alitalia Linee Aeree Italiane, S.P.A.*, 274 F.3d 683, 686 (2d Cir. 2011).  "The purpose of this [ ] requirement is to give the administrative agency the opportunity to investigate, mediate, and take remedial action."  *Fowlkes v. Ironworkers Local 40*, 790 F.3d 378, 384 (2d Cir. 2015) (citation omitted).

Exhaustion is a "precondition" of suit that operates as an affirmative defense.  *Hardaway v. Hartford Public Works Dep't*, 879 F.3d 486, 490 (2d Cir. 2018).  "Although a plaintiff is not required to explicitly plead or demonstrate exhaustion at the pleading stage," failure-to-exhaust can raised on a pre-answer motion to dismiss "if it is clear from the face of the complaint that a plaintiff has not exhausted their remedies."  *Arnold v. Rsch. Found. for State Univ. of N.Y.*, 216 F. Supp. 3d 275, 287 (E.D.N.Y. 2016) (collecting cases).

Measured against this exhaustion requirement, virtually all of plaintiff's Title VII claims are subject to dismissal.  In her amended complaint, plaintiff attached the right-to-sue letters she received from the EEOC.  Am. Compl. at 7, 10.  Both letters reference "Charge No. 525-2022-00609."  *Id*.  In support of its motion to dismiss, OPWDD attached the matching EEOC charges that plaintiff filed with the agency.  Ex. A to Matula Aff., Dkt. No. 31-3 (signed April 26, 2022); Ex. B to Matula Aff., Dkt. No. 31-4 (signed August 30, 2023).

Although the Court would not ordinarily consider documents outside the pleading in this procedural posture, Hawley's amended complaint repeatedly references the EEOC charges and the agency's investigation.  The two documents offered by OPWDD also bear the charge number

referenced in the pleading.  Under those circumstances, "[c]ourts in this Circuit have repeatedly held that when EEOC charges are expressly referred to in the pleading, they may be considered incorporated by reference."  *Muhammad v. N.Y. City Trans. Auth.*, 450 F. Supp. 2d 198, 204–05 (E.D.N.Y. 2006) (collecting cases).  Even assuming otherwise, though, they are public records of which the Court may ordinarily take judicial notice.  *See id.*

In the initial and amended EEOC charge, Hawley identifies "sex" discrimination that took place at its "earliest" and "latest" on September 23, 2021:

> I am a female (Lesbian.)  I have worked for Respondent since 1996.  My current position is Rehabilitation Counselor II.  The past few TTL positions I have applied for (as a promotion) have been packed with qualifying candidates who have scored higher than me.  If I were given a fair chance back in 2013 and on I could have been a TTL by now.  At this moment, I am not eligible to sit to interview for this position unless I scored a 95 or higher.  The last job denial occurred on or about September 23, 2021.  In October 2019, I filed with GOER through my Union an internal complaint of job advancement discrimination.  In the end, I never received a resolution of my complaint.  I have been passed over for promotion even when the person who was awarded the position had significantly less years on the job, a lower education degree, no previous experience working in Program Operations, and had little or no supervisory experience.  I believe that I have been denied promotion because of my sexuality in violation of [Title VII].

Ex. A; Ex. B.  In other words, OPWDD is correct that the only adverse job action identified by plaintiff in her EEOC charge is for the missed promotion on September 23, 2021.

This exhaustion requirement could be fatal to Hawley's timely discrete-act claims.  "The administrative exhaustion requirement applies to *pro se* and counseled plaintiffs alike."  *Fowlke*, 790 F.3d at 384.  Although this requirement is subject to equitable defenses, *see Hardaway*, 879 F.3d at 490, the Second Circuit has affirmed the dismissal of a *pro se* litigant's Title VII claims when the plaintiff failed to exhaust them.  *Buon v. Spindler*, 65 F.4th 64, 77–78 (2d Cir. 2023).

Notably, however, there is an exception to the exhaustion requirement for claims that are "reasonably related" to a charge that was presented to the EEOC. *Shah v. N.Y. State Dep't of Civ. Serv.*, 168 F.3d 610, 614 (2d Cir. 1999). "This exception to the exhaustion requirement for reasonably related claims is based on the recognition that EEOC charges frequently are filled out by employees without the benefit of counsel and that their primary purpose is to alert the EEOC to the discrimination that a plaintiff claims she is suffering." *Littlejohn v. City of N.Y.*, 795 F.3d 297, 322 (2d Cir. 2015) (cleaned up).

Broadly speaking, the Second Circuit has recognized three situations in which a claim is "reasonably related" to an EEOC charge: (1) if the complained-of conduct would fall within the scope of the agency's investigation that could reasonably be expected to grow out of the charge of discrimination; (2) if the claim alleges retaliation against the employee for filing the EEOC charge; or (3) if the claim alleges further incidents of discrimination carried out in precisely the same manner alleged in the EEOC charge. *Marinacci v. U.S. Postal Serv.*, 403 F. Supp. 3d 116, 124–25 (E.D.N.Y. 2017) (cleaned up) (collecting cases).

As OPWDD acknowledges in its motion to dismiss, this "reasonably related" exception certainly applies to Hawley's claim for alleged retaliation on January 11, 2023, when defendant moved plaintiff to the "worst cubicle" in "possible retaliation" for filing her first rebuttal with the EEOC. *Duplan*, 888 F.3d at 622 (characterizing retaliation that occurs while an EEOC charge is pending as the "paradigmatic case" for application of "reasonably related" doctrine).

The question of whether this exception applies to save Hawley's *other* timely claims is a little more difficult. "In determining whether claims are reasonably related, the focus should be on the factual allegations made in the EEOC charge itself, describing the discriminatory conduct about which a plaintiff is grieving." *Deravin v. Kerik*, 335 F.3d 195, 201 (2d Cir. 2003) (cleaned

up) *Alonzo v. Chase Manhattan Bank, N.A.*, 25 F. Supp. 2d 455, 458 (S.D.N.Y. 1998) ("[I]t is the

substance of the charge and not its label that controls.").

But Hawley is *pro se*.  Although her EEOC charges identified only a single instance of a

failure-to-promote that occurred on September 23, 2021, a liberal reading of these EEOC filings

indicates that plaintiff was broadly complaining of being passed over for promotions and career

advancement because of her sexuality or sexual orientation.  *Jute v. Hamilton Sundstrand Corp.*,

420 F.3d 166, 177 (2d Cir. 2005) (explaining the "reasonably related" standard means "[l]oose

pleading is permitted before the EEOC").

Viewed in that light, all of the events on or after September 23, 2021; *i.e.*, the "earliest"

date of discrimination identified in Hawley's initial and amended EEOC charge, are sufficiently

"reasonably related" to be considered exhausted, either because these complained-of job actions

would have fallen within the scope of the agency's investigation into sex- or sexual-orientation-

based discrimination or because these job actions amount to further incidents of discrimination

carried out in allegedly the same manner.  The same is true of the timely instances of retaliation,

which are fairly considered as a possible response to plaintiff's EEOC charge.  Accordingly, the

Court will proceed to consider the plausibility of those discrete-act claims.

### C.  The Merits

On the merits, Hawley's amended complaint implicates three[5] conceptually distinct legal

theories under Title VII: (1) instances of "disparate treatment" based on her sex and/or her sexual

---

[5]  A disparate-treatment claim can also be pleaded as a "pattern-or-practice suit," which is when a class of plaintiffs challenge an employer's standard operating procedure.  *See, e.g.*, *United States v. City of N.Y.*, 717 F.3d 72, 82 (2d Cir. 2013).  Title VII also protects employees from facially neutral employment practices that have a "disparate impact."  *See, e.g.*, *Mandala v. NTT Data, Inc.*, 975 F.3d 202, 208 (2d Cir. 2020).  Broadly speaking, these theories require the plaintiff to challenge a specifically identifiable practice or policy.  Neither theory fits plaintiff's facts.

orientation, followed by (2) incidents of "retaliation" in response to her EEOC charge, that, when considered together with other relevant circumstances, created a (3) "hostile work environment."

OPWDD argues that to the extent one or more of these Title VII claims are timely *and* exhausted, Hawley's amended complaint fails to plausibly allege facts that give rise to even the minimal inference of sex- or sexual-orientation-based animus or retaliatory intent necessary to avoid pre-answer dismissal. *See* Def.'s Mem. at 11–23.

### 1. Disparate Treatment

First, Hawley complains about multiple instances in which OPWDD treated her less favorably than others; *i.e.*, passed her over for promotions, because she identifies as a lesbian woman in a same-sex relationship. In other words, plaintiff has alleged "disparate treatment" based on her "sex" or her "sexual orientation," which can be actionable if the defendant had a discriminatory intent or motive in taking the adverse job action against the plaintiff. *Bostock v. Clayton Cnty., Ga.*, 590 U.S. 644, 658 (2020) (recognizing Title VII's applicability to claims based on plaintiff's sexual orientation); *Watson v. Fort Worth Bank & Tr.*, 487 U.S. 977, 986 (1988) (requiring proof of discriminatory intent or motive for disparate-treatment claims).

An employer's discriminatory intent or motive can be shown with direct evidence. *Price Waterhouse v. Hopkins*, 490 U.S. 228, 258 (1989). Direct evidence of discriminatory intent or motive exists when "an impermissible criterion was *in fact* a 'motivating' or 'substantial' factor in the employment decision." *de la Cruz v. N.Y. City Hum. Res. Admin. Dep't*, 82 F.3d 16, 23 (2d Cir. 1996) (cleaned up). Direct evidence can be shown by "a workplace policy, practice or decision [that] relies expressly on a protected characteristic," *Young v. United Parcel Serv., Inc.*, 575 U.S. 206, 213 (2015), or "conduct or statements by persons involved in the decision making

process that may be viewed as directly reflecting the alleged discriminatory attitude," *Ostrowski v. Atl. Mut. Ins. Cos.*, 968 F.2d 171, 182 (2d Cir. 1992).

But direct evidence of intent is rare. As the Second Circuit has repeatedly recognized, "[a]n employer who discriminates is unlikely to leave a 'smoking gun,' such as a notation in an employee's personnel file, attesting to a discriminatory intent." *Rosen v. Thornburgh*, 928 F.2d 528, 533 (2d Cir. 1991). Accordingly, most discrimination cases rely on the combined force of indirect proof: "bits and pieces of information" that, when taken together, support an inference of intentional discrimination. *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 86 (2d Cir. 2015).

Title VII disparate-treatment claims based on indirect evidence have a plaintiff-friendly "motivating factor" standard of causation. *Comcast Corp. v. Nat'l Ass'n of African Am.-Owned Media*, 589 U.S. 327, 337 (2020). Historically, however, the "adverse action" component of this kind of claim was more rigorous: the plaintiff had to show a "materially adverse" change in the terms and conditions of her employment. *See Williams v. R.H. Donnelley, Corp.*, 368 F.3d 123, 128 (2d Cir. 2004). Recently, though, in a case called *Muldrow v. City of St. Louis, Missouri*, the Supreme Court held that a plaintiff is not required to meet any "heightened threshold of harm" in the disparate-treatment context. 601 U.S. 346, 353 (2024). Instead, a plaintiff only needs to show "*some* harm respecting an identifiable term or condition of employment." *Id*. (emphasis added). Under the right circumstances, non-economic and intangible harms can suffice. *Banks v. Gen. Motors, LLC*, 81 F.4th 242, 270 (2d Cir. 2023).

In sum, at the pleadings stage, a Title VII disparate-treatment plaintiff must plausibly allege that her defendant-employer took a job action that left her worse off in some identifiable way "at least in part for a discriminatory reason, and she may do so by alleging facts that directly

show discrimination or facts that indirectly show discrimination by giving rise to a plausible inference of discrimination." *Vega*, 801 F.3d at 87.

Measured against this general legal standard, all of Hawley's timely, exhausted disparate-treatment claims must be dismissed. Even liberally construed, all but one of her claims based on missed promotions lack any of the basic factual details that might render them "plausible" for purposes of a motion to dismiss. To be sure, plausibility "depends on a host of considerations: the full factual picture presented by the complaint, the particular cause of action and its elements, and the existence of alternative explanations so obvious that they render plaintiffs' inferences unreasonable." *Fink v. Time Warner Cable*, 714 F.3d 739, 741 (2d Cir. 2013). At a minimum, though, the plaintiff must still allege some facts that provide "at least minimal support for the proposition that the employer was motivated by discriminatory intent." *Buon*, 65 F.4th at 79.

Hawley has not done so. Mindful of her *pro se* status, the Court initially identified as many as twenty-three occasions on which OPWDD might have failed to promote plaintiff. After accounting for timeliness and exhaustion, this number dropped to sixteen.[6] There is no question that these missed promotions qualify as adverse job actions. *See, e.g.*, *Buon*, 65 F.4th at 80 (treating failure-to-promote as a "well settled" kind of discrimination claim); *Mitchell v. Planned Parenthood of Greater N.Y., Inc.*, 745 F. Supp. 3d 68, 90–91 (S.D.N.Y. 2024) (collecting cases for proposition that Supreme Court's holding in *Muldrow* applies broadly to other adverse acts).

The problem for Hawley is that fifteen of her remaining claims; *i.e.*, the ones set forth in the Background in parts II.D, II.E, and II.F, *supra* (with the exception of the September 25, 2023 incident, discussed *infra*) are framed in wholly conclusory terms. Am. Compl. ¶¶ 22, 24, 25, 56, 57, 62, 79, 81, 90, 93, 94, 101, 102. In each instance, plaintiff merely alleges that she applied for

---

[6] As defendant notes in its own moving papers (which identified twenty-two possible job actions), it is likely that this calculation inadvertently double-counted one or more of plaintiff's missed promotions.

a promotion and that a non-lesbian received the job instead.  Plaintiff has not offered any factual

basis on which to plausibly infer that her protected characteristic is connected to any intentional

misconduct attributable to OPWDD.  Courts dismiss conclusory allegations like these as lacking

in plausibility for purposes of a Title VII claim.  *See, e.g.*, *Lee v. Riverbay Corp.*, 751 F. Supp.

3d 259, 278 (S.D.N.Y. 2024) (noting that allegations of discrimination structured in wholly

conclusory terms are a "common (and patently defective) pleading technique").

Importantly, the Supreme Court has cautioned that otherwise time-barred discrimination

and retaliation claims should still be considered as relevant background evidence when assessing

the viability of a plaintiff's timely claims.  *See Morgan*, 536 U.S. at 112; *see also Davis-Garett v.

Urban Outfitters, Inc.*, 921 F.3d 30, 42 (2d Cir. 2019) ("[E]ven with respect to a claim of discrete

discriminatory or retaliatory acts, expiration of the limitations period does not bar an employee

from using the prior acts as background evidence in support of a timely claim.").

But a consideration of the broader picture offered by Hawley's amended complaint does

not lead to a different conclusion.  Elsewhere, plaintiff alleges that she has been "very out and

open" about her sexuality since 2008 and has pictures of her wife and two children displayed at

work.  Am. Compl. ¶¶ 115–16.  Plaintiff also alleges that "[a]t least one person on the interview

panels admitted during the EEOC investigation to knowing that [she] was a lesbian."  *Id.* ¶ 112.

In plaintiff's view, "[i]t is possible that this one person with knowledge of [her] sexuality could

have influenced the others in not choosing [her] for the promotion" or that "other members of the

interview panel did indeed know about [her] sexuality but decided not to tell the truth to the

EEOC investigator."  *Id.* ¶¶ 113–14.

This is not enough to unlock discovery on these claims.  At best, Hawley has established

that some of her co-workers and/or supervisors were aware of her sexual orientation and that this

knowledge "possibly" had something to do with one or more of her missed promotions. In other words, it is *conceivable* that one or more of these adverse job actions were somehow the product of intentional discrimination. But plaintiff has not offered any *plausible* reason to infer that any particular incident was motivated, in whole or in any part, by discriminatory animus. *Vega*, 801 F.3d at 87 (requiring disparate-treatment plaintiff to allege minimal facts sufficient to "nudge her claims across the line from conceivable to plausible").

The sole exception to the wholly conclusory framing found through Hawley's amended complaint is the missed promotion alleged in connection with September 25, 2023. Am. Compl. ¶ 82. There, plaintiff alleges that she interviewed for Treatment Team Leader, that she was not awarded the position, and that a less-qualified, less-experienced woman named Johanna Reed received this promotion instead of her. *Id.* ¶¶ 83, 85–87, 105–109. Plaintiff further alleges that Ms. Reed had a "very close friend" on this interview panel. *Id.* ¶ 84. In plaintiff's view, this interviewer should have recused herself. *Id.* Plaintiff shared this information with her union representative and met with OPWDD's Deputy Director, who assured plaintiff that defendant's managers "were aware and that they were 'keeping an eye on the situation.'" *Id.* ¶¶ 88–89.

Even accounting for Hawley's *pro se* status, this incident does not give rise to a plausible disparate-treatment claim. "Under Title VII, a plaintiff may succeed simply by establishing that sex (or another protected characteristic) was a motivating factor for any employment practice, even though other factors also motivated the practice." *Naumovski v. Norris*, 934 F.3d 200, 213 (2d Cir. 2019). Importantly, however, "[a]llegations of unfair treatment directed at a member of a protected class do not establish a claim absent a basis to conclude that unfair treatment arose because of the victim's membership in that class." *Paupaw-Myrie v. Mt. Vernon City Sch. Dist.*, 653 F. Supp. 3d 80, 105–06 (S.D.N.Y. 2023).

Liberally construed, Hawley has alleged an incident of possible favoritism, which may have violated her employer's workplace rules (or perhaps some state law, since she works for a state-funded agency). But plaintiff has not plausibly alleged an instance of intentional sex- or sexual-orientation-based discrimination. *See, e.g.*, *Henek v. CSC Holdings, LLC*, 449 F. Supp. 3d 35, 45 (E.D.N.Y. 2020) (rejecting as "false syllogism" a Title VII claim based on allegations that "something bad happened to me at work; therefore the bad thing happened to me because I am (fill in the protected class)"). Accordingly, plaintiff's Title VII disparate-treatment claims based on her missed promotions must be dismissed.

### 2. Retaliation

Second, Hawley complains about suffering from instances of "retaliation" after filing her administrative charge with the EEOC and participating in the agency's investigation. Claims for retaliation are actionable under Title VII if the defendant had a retaliatory intent when taking the adverse action at issue. *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 69 (2006). In particular, "Title VII prohibits an employer from discriminating against an employee because the employee has engaged in protected activity." *Banks v. Gen. Motors, LLC*, 81 F.4th 242, 275 (2d Cir. 2023) (citation omitted). "Protected activity includes opposing an unlawful employment practice or otherwise making a charge, testifying, assisting, or participating in any manner in an investigation, proceeding or hearing." *Id.* (cleaned up).

As with Title VII's anti-discrimination provision, a plaintiff can show their employer's retaliatory animus with direct evidence. *Mandell v. Cnty. of Suffolk*, 316 F.3d 368, 383 (2d Cir. 2003). But direct evidence of retaliatory animus is also rare. *See, e.g.*, *Tyler v. Bethlehem Steel Corp.*, 958 F.2d 1176, 1183 (2d Cir. 1992). After all, "[d]irect evidence is essentially an outright admission that a challenged action was undertaken for one of the forbidden reasons covered in

Title VII." *Cardoso v. Robert Bosch Corp.* 427 F.3d 429, 432 (7th Cir. 2005). Consequently, retaliation claims tend to rely on the aggregate weight of circumstantial proof as well. *See, e.g.*, *Hicks v. Baines*, 593 F.3d 159, 170 (2d Cir. 2010).

Unlike claims for disparate treatment, retaliation claims require a classic showing of "but-for" causation. *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 352 (2013). But events often have multiple but-for causes. *Bostock*, 590 U.S. at 656 (cautioning courts not to lean too heavily on this distinction). Thus, in order to adequately plead causation, "a plaintiff must plausibly plead a connection between the act and [her] engagement in protected activity." *Vega*, 801 F.3d at 90. "Causation may be shown by direct evidence of retaliatory animus or inferred through temporal proximity to the protected activity." *Duplan*, 888 F.3d at 625.

Title VII's anti-retaliation provision also imposes a materiality standard; *i.e.*, an "adverse action" requirement. In the retaliation context, "an adverse employment action is any action that could well dissuade a reasonable worker from making or supporting a charge of discrimination." *Vega*, 801 F.3d at 90 (citation omitted). "This definition covers a broader range of conduct than does the adverse-action standard for claims of discrimination under Title VII." *Id.*

As the Supreme Court has explained:

> Context matters. The real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed. A schedule change in an employee's work schedule may make little difference to many workers, but may matter enormously to a young mother with school-age children. A supervisor's refusal to invite an employee to lunch is normally trivial, a nonactionable petty slight. But to retaliate by excluding an employee from a weekly training lunch that contributes significantly to the employee's professional advancement might well deter a reasonable employee from complaining about discrimination.

*White*, 548 U.S. at 69 (cleaned up). In sum, at the pleadings stage, a retaliation plaintiff must plausibly allege that (1) the defendant discriminated against her, or took some other "adverse action" against her, (2) "because" she opposed an "unlawful employment practice." *Vega*, 801 F.3d at 90.

Measured against this legal standard, Hawley's timely, exhausted retaliation claims must be dismissed because she has not plausibly alleged misconduct that would have been "materially adverse" to a reasonable employee. As the Supreme Court has explained, this objective standard works to separate "significant from trivial harms." *White*, 548 U.S. at 54. "Actions that are 'trivial harms'—*i.e.*, 'those petty slights or minor annoyances that often take place at work and that all employees experience'—are not materially adverse." *Tepperwien v. Entergy Nuclear Ops., Inc.*, 663 F.3d 556, 568 (2d Cir. 2011). Of course, "some actions may take on more or less significance depending on the context." *Id.* But the Supreme Court's decision in *Muldrow* "did not alter the existing understanding that Title VII's anti-retaliation provision 'covers those (and only those) employer actions that would have been materially adverse to a reasonable employee or job applicant.'" *Mitchell*, 745 F. Supp. 3d at 91 (quoting *White*, 548 U.S. at 57).

Hawley's amended complaint does not plausibly allege any materially adverse actions. For instance, plaintiff complains she was relocated to the "worst cubicle location in the entire building" shortly after she filed her first EEOC rebuttal. Am. Comp. ¶ 47. As plaintiff explains, this "infamous" cubicle is "two feet away from an outside door with a high traffic area" and is always "cold or hot depending on the season." *Id.* ¶¶ 48–49. According to plaintiff, OPWDD forced her to move in "possible retaliation" for filing her rebuttal. *Id.* ¶ 47; Timeline at 2.

This is not enough to survive dismissal. Absent plausible allegations that the workspace posed a threat to health or safety, courts have rejected retaliation claims based on an employer's

decision to relocate the plaintiff to other, allegedly inferior, spaces. *Compare Krul v. Brennan*, 501 F. Supp. 3d 87, 97 (N.D.N.Y. 2020) (denying motion to dismiss retaliation claim based on forced relocation to an "unsafe space"), *with Alvarado v. United Hospice, Inc.*, 631 F. Supp. 3d 89, 118 (S.D.N.Y. 2022) (granting summary judgment where plaintiff complained of relocation), *Ballard v. Children's Aid Soc'y*, 781 F. Supp. 2d 198, 208 (S.D.N.Y. 2011) (granting summary judgment where plaintiff complained of reassignment to "shared office" or to "an office without a telephone or computer"), *and Newell v. State Univ. of N.Y. Westchester Cmty. Coll.*, 2023 WL 4082030, at *4 (S.D.N.Y. June 30, 2023) (granting motion to dismiss where the plaintiff alleged forced workplace relocation).

Hawley's remaining retaliation claims fare no better. Plaintiff complains that on August 1, 2023, she hid behind her desk because she heard and saw the person who had threatened her during a "behavioral episode." *See* Am. Compl. ¶¶ 58, 65. Plaintiff reported this incident to an HR representative, who "instructed the staff with the individual to leave immediately." *Id.* ¶ 67. According to plaintiff, an unidentified co-worker told her that "management knew about this and let it happen anyway." *Id.*

Even liberally construed, this incident is not actionable as a Title VII retaliation claim against OPWDD. As the Supreme Court has cautioned, "context matters." *White*, 548 U.S. at 69. Plaintiff's employer is a state agency that works with individuals who are developmentally disabled. The individual in question is someone who receives defendant's services. Indeed, plaintiff alleges that she was "working overtime" at one of defendant's housing facilities when this person experienced the "behavioral episode" that led her and a co-worker to press charges.

Notably, Hawley alleges that she reported this incident, that an HR representative took immediate action, and that she secured a Safety Plan. Am. Compl. ¶¶ 65–76. Other than the

allegation that an unidentified co-worker told her that "management knew about this and let it happen anyway," *id*. ¶ 68, there is no plausible indication that this incident was at all related to plaintiff's participation in any protected activity, such as the ongoing EEOC investigation.  Even assuming otherwise, though, there is no reason to think that any of this conduct—to the extent it might be fairly chargeable to defendant—"could well dissuade a reasonable worker from making or supporting a charge of discrimination," as required by the Supreme Court's holding in *White*.

Hawley also complains that on November 9, 2023, Ms. Reed—who had recently been promoted over plaintiff—"came up behind" her and "glared at [her] just a few inches from the back of [her] head" while she was on a video call.  Am. Compl. ¶ 95.  According to plaintiff, her co-worker "saw this clearly."  *Id*. ¶ 95.  This left plaintiff and her co-worker "stunned" and they "immediately stopped [their] meeting."  *Id*. ¶ 95.  Plaintiff reported the incident to Ms. Reed's supervisor, who agreed to speak with Ms. Reed about this behavior.  *Id*. ¶¶ 99–100.

This does not rise to the level of an actionable retaliation claim against OPWDD, either. Although the inquiry is highly context-dependent, courts routinely dismiss claims that are based on rude comments or impolite stares.  *See, e.g.*, *Rasko v. N.Y. City Admin. for Children's Servs.*, 734 F. App'x 52, 55 (2d Cir. 2018) (summary order) (affirming dismissal where plaintiff alleged her supervisor was "rude to her in a meeting and 'oddly' spoke to her"); *Tepperwien*, 663 F.3d at 571–72 (holding supervisor's "comment and stare" during a meeting were not materially adverse actions for purposes of a retaliation claim).

In sum, even when "considered both separately and in the aggregate," *Hicks*, 593 F.3d at 165, and mindful of the fact that "even trivial acts may take on greater significance when they are viewed as part of a larger course of conduct," *Tepperwien*, 663 F.3d at 568, none of the actions about which Hawley complains would plausibly dissuade an objectively reasonable

employee from "making or supporting a charge of discrimination." *White*, 548 U.S. at 57.

Accordingly, plaintiff's Title VII retaliation claims must be dismissed.

### 3. Hostile Work Environment

Third, Hawley complains that OPWDD subjected her to a "hostile work environment,"

which is actionable if the plaintiff shows that "the workplace is permeated with 'discriminatory

intimidation, ridicule, and insult' that is 'sufficiently severe or pervasive to alter the conditions of

the [plaintiff's] employment and create an abusive working environment.'" *Harris v. Forklift

Sys., Inc.*, 510 U.S. 17, 21 (1993) (quoting *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 55, 65–

67 (1986)).

Unlike claims based on discrete acts of discrimination or retaliation, "incidents that give

rise to a hostile work environment 'occur[ ] over a series of days or perhaps years and . . . a

single act of harassment may not be actionable on its own.'" *Banks*, 81 F.4th at 259 (quoting

*Morgan*, 536 U.S. at 115). Thus, "[t]he alleged conduct in many hostile work environment cases

must be repeated or ongoing before it is adequately severe or pervasive to constitute a violation."

*Gonzalez v. Hasty*, 802 F.3d 212, 220 (2d Cir. 2015).

"To state a claim for a hostile work environment in violation of Title VII, a plaintiff must

plead facts that would tend to show that the complained of conduct: (1) is objectively severe or

pervasive—that is, . . . creates an environment that a reasonable person would find hostile or

abusive; (2) creates an environment that the plaintiff subjectively perceives as hostile or abusive;

and (3) creates such an environment because of the plaintiff's sex [or sexual orientation]." *Krul*,

501 F. Supp. 3d at 98 (citation omitted).

Measured against this legal standard, Hawley's hostile work environment claim must be

dismissed. As an initial matter, all of the events described in plaintiff's amended complaint must

be factored into this analysis, even those that are untimely or unexhausted. *See, e.g.*, *Hampton v. Wilkie*, 554 F. Supp. 3d 512, 521 (E.D.N.Y. 2021) ("Hostile work environment claims fall under the 'continuing violation' exception to the timeliness requirement.").

But consideration of this broader set of facts still leads to the same conclusion. Liberally construed, there is no question that plaintiff *subjectively* perceives her work environment to be "hostile or abusive." But she has not plausibly alleged any facts tending to show that her work environment was *objectively* "hostile or abusive." *Pucino v. Verizon Wireless Commc'ns, Inc.*, 618 F.3d 112, 119 (2d Cir. 2010) (cautioning this is a disjunctive standard). Nor, for that matter, has she plausibly alleged that any of the complained-of conduct was fairly attributable to any sex- or sexual-orientation-based animus. *Tolbert v. Smith*, 790 F.3d 427, 439 (2d Cir. 2015) (requiring showing that "the hostile conduct occurred because of a protected characteristic").

Hawley has worked for OPWDD for nearly thirty years. Am. Compl. ¶ 40. She alleges that after speaking openly about her sexual orientation, she received a nomination for Supervisor of the Year (in 2010), hosted the Commissioner for a visit (in 2015), was celebrated by her co-workers with baby showers (in 2018 and 2020), and hosted a second visit for the Commissioner (in 2021). *Id.* ¶¶ 37, 115,137, 139. Plaintiff received promotions in 2018 and 2022. *Id.* ¶¶ 7, 29. She was nominated for Employee of the Year in 2022. *Id.* ¶ 32.

As discussed at length *supra*, the missed promotions and other incidents complained of by Hawley in her amended complaint are insufficient to warrant discovery, either because they are framed in conclusory terms or because they allege conduct that is not actionable under the relevant governing law.[7] These incidents, even considered in the aggregate, are not enough to

---

[7] Because OPWDD appears to be a state-funded agency, the Court has also considered whether Hawley might have any 42 U.S.C. § 1983 claims. Although § 1983 can reach individual actors and has a three-year (rather than 300-day) limitations period, *Shomo v. City of N.Y.*, 579 F.3d 176, 181 (2d Cir. 2009), the legal standard roughly mirrors Title VII, *Naumovski*, 934 F.3d at 212. Accordingly, any § 1983 claims would fail on plausibility grounds as well.

warrant discovery into a sex- or sexual-orientation-based claim for a hostile work environment, either.[8] *See Yost v. Everyrealm, Inc.*, 657 F. Supp. 3d 563, 582 (S.D.N.Y. 2023) (dismissing hostile work environment claim where plaintiff merely alleged that co-workers knew about her sexual orientation). Accordingly, plaintiff's hostile work environment claim must be dismissed.

### D. State Law Claims

Broadly construed, Hawley's amended complaint also asserts claims under the New York State Human Rights Law ("HRL"). Am. Compl. at 4; Def.'s Mem. at 4 (noting HRL claims).

Generally speaking, federal courts "have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy." 28 U.S.C. § 1367(a). This requirement is satisfied when the state and federal claims "derive from a common nucleus of operative fact." *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 725 (1966). "[O]nce it is determined that a supplemental claim is related to the claim within the court's original jurisdiction such that the form the same case or controversy, supplemental jurisdiction over the related claim is mandatory." *Catzin v. Thank You & Good Luck Corp.*, 899 F.3d 77, 85 (2d Cir. 2018) (citation omitted).

Even so, a federal court may decline to exercise supplemental jurisdiction where "(1) the claim raises a novel or complex issue of State law, (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction, (3) the district court has dismissed all claims over which it has original jurisdiction, or (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction." 28 U.S.C. § 1367(c).

---

[8] A review of plaintiff's most recent extraneous filing does not alter this conclusion. Dkt. No. 39. There, plaintiff references in wholly conclusory terms "25 different re-trainings," being "stripped" of supervisory duties altogether," and instances where a co-worker has "walked past [her] desk four times within 1.5 hours." *Id.*

Measured against this general legal standard, the Court declines to exercise supplemental jurisdiction over Hawley's HRL claims. As explained *supra*, all of plaintiff's federal-law claims must be dismissed. Under those circumstances, courts typically decline to exercise supplemental jurisdiction over any related state-law claims. *Walker v. Time Life Films, Inc.*, 784 F.2d 44, 53 (2d Cir. 1986) (endorsing this approach absent "exceptional circumstances").

There are no exceptional circumstances presented here. If anything, recent amendments to the HRL have injected confusion about the precise standard of liability for some of the state-law analogues to the Title VII claims discussed at length *supra*. *See, e.g.*, *Yost*, 657 F. Supp. 3d at 578 (noting state-law amendments lowered the standard for pleading and proving a hostile work environment). Where, as here, one or more of the § 1367(c) categories apply, the better course of action is to decline supplemental jurisdiction and allow the plaintiff to decide whether or not to pursue her state-law claims in state court. *See, e.g.*, *Kolari v. N.Y.-Presbyterian Hosp.*, 455 F.3d 118, 122 (2d Cir. 2006). Accordingly, plaintiff's state-law claims will be dismissed without prejudice.

### E. Leave to Amend

The final question is whether Hawley should be given an opportunity to try to further amend her pleading. "Generally, leave to amend should be freely given, and a *pro se* litigant in particular should be afforded every reasonable opportunity to demonstrate that [she] has a valid claim." *Matima v. Celli*, 228 F.3d 68, 81 (2d Cir. 2000) (cleaned up). "Where it appears that granting leave to amend is unlikely to be productive, however, it is not an abuse of discretion to deny leave to amend." *Ruffolo v. Oppenheimer & Co.*, 987 F.2d 129, 131 (2d Cir. 1993).

After considering the matter, Hawley will not be given leave to further amend because it is unlikely to be productive. Plaintiff has already amended her pleading once. A comparison of

her original and amended pleadings shows that she is complaining of the same alleged actions in more or less the same conclusory manner. Consideration of her extraneous materials, such as the Timeline and other exhibits, does not suggest that plaintiff could amend her pleading to state an actionable Title VII claim, since her filings fail to suggest that any of the adverse actions were motivated, in whole or in part, by discriminatory or retaliatory animus. Accordingly, plaintiff will not be given leave to further amend.

V.    **CONCLUSION**

Plaintiff's amended complaint must be dismissed. Liberally construed, she has failed to plausibly allege any cognizable Title VII claims. However, plaintiff's state-law claims will be dismissed without prejudice to re-filing in state court if she desires to pursue them in that forum.

Therefore, it is

ORDERED that

1.  Defendant's motion to dismiss (Dkt. No. 31) is GRANTED;

2.  Plaintiff's amended complaint (Dkt. No. 30) is DISMISSED without leave to amend;

3.  Plaintiff's federal-law claims are DISMISSED with prejudice; and

4.  Plaintiff's state-law claims are DISMISSED without prejudice.

The Clerk of the Court is directed to terminate the pending motion, enter a judgment accordingly, and close the file.

**IT IS SO ORDERED.**

Dated:  April 16, 2025
      Utica, New York.

Anthony J. Brindisi
U.S. District Judge